**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| In re NATIONAL CITY CORPORATION | )  **MDL No.:  2003** |
| **SECURITIES, DERIVATIVE & ERISA** | )  **Case No.:  1:08-nc-70015** |
| **LITIGATION** | )  **JUDGE SOLOMON OLIVER, JR.** |
| | ) |
| **This document is applicable to:** | ) |
| *Reagan v. National City Corp., et al.* | ) |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE COMPLAINT**

BERMAN DEVALERIO
Michael J. Pucillo
[Florida Bar Registration No. 261033]
E-mail:  mpucillo@bermandevalerio.com
Wendy H. Zoberman
[Florida Bar Registration No. 434670]
Email:  wzoberman@bermandevalerio.com
4280 Professional Center Drive, Suite 350
Palm Beach Gardens, FL  33410
Telephone:     (561) 835-9400
Facsimile:      (561) 835-0322

and

Abigail R. Romeo
[Massachusetts Bar Registration No. 657680]
E-mail:  aromeo@bermandevalerio.com
1 Liberty Square
Boston, MA 02109
Telephone:     (617) 542-8300
Facsimile:      (617) 542-1194
*Attorneys for Plaintiff B.H. Reagan*

December 9, 2009

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................ 1

PROCEDURAL HISTORY ............................................................................................... 3

STATEMENT OF FACTS ................................................................................................ 4

    I.    Background of Fidelity Acquisition ................................................................. 4

    II.    The 2007-208 Mortgage and Real Estate Crisis
        *Exposes* the Materially Misleading Statements
        and/or Omissions in the Registration Statement ............................................ 5

        A.  National City's Subprime Construction Loans ............................................ 5

        B.  National City's Mischaracterization of
            Nonperforming Loans ................................................................................. 5

        C.  National City's Understated Loan Loss Reserves ...................................... 6

    III.    Subsequent History ....................................................................................... 7

ARGUMENT ..................................................................................................................... 7

    I.    LEGAL STANDARDS APPLICABLE TO A
        MOTION TO DISMISS ................................................................................ 7

    II.    THE COMPLAINT ADEQUATELY STATES A
        CLAIM UNDER SECTION 11 ..................................................................... 8

        A.  Section 11 Liability ..................................................................................... 8

        B.  National City's Registration Statement Contained
            False and Misleading Statements and Omissions ..................................... 10

            1.  The Complaint Adequately Pleads
               Actionable Misstatements Regarding Loans
               Originated by NCM ........................................................................... 12

            2.  The Complaint Adequately Pleads Actionable
               Misstatements Concerning National City's
               Nonperforming Loans ........................................................................ 16

3. The Complaint Adequately Pleads Actionable
Misstatements Concerning Loan Loss Reserves..................................19

    a) *Affirmative Misrepresentations*............................................20

    b) *Misstatements Regarding Loan Loss
Reserves are Actionable Under the
Federal Securities Laws*........................................................21

    c) *Reserves Relate To The Current Period
And Are Not Forward Looking
Statements* ...........................................................................22

    d) *A Failure to Restate Does Not Absolve
Defendants of Liability for Violating
the Federal Securities Laws*.................................................25

C. Defendants Fail to Establish a Negative Causation
Defense .....................................................................................................26

III. THE COMPLAINT ADEQUATELY STATES CONTROL
PERSON CLAIMS UNDER SECTION 15 OF THE
SECURITIES ACT ..........................................................................................29

IV. THE COMPLAINT ADEQUATELY STATES A
SECTION 11 CLAIM AGAINST DEFENDANT
ZOELLER.........................................................................................................29

CONCLUSION...........................................................................................................30

**Cases**

*Alaska Elec. Pension Fund v. Adecco S.A.*
  434 F. Supp. 2d 815 (S.D. Cal. 2006) ..................................................................... 24

*Aldridge v. A.T. Cross Corp.*
  284 F.3d 72 (1st Cir. 2002) .................................................................................... 25

*Arkansas Pub. Employee Ret. Sys. v. GT Solar Int'l*
  Civil No. 08-cv-312-JL,
  2009 U.S. Dist. LEXIS 93820 (D.N.H. Oct. 7, 2009) ........................................... 10

*Ashcroft v. Iqbal*
  129 S. Ct. 1937 (2009) ............................................................................................. 7

*Bell Atl. Corp. v. Twombly*
  127 S. Ct. 1955 (2007) ......................................................................................... 7, 8

*Belodoff v. Netlist, Inc.*
  CV 07-00677,
  2008 WL 2356699 (C.D. Cal. May 30, 2008) ....................................................... 11

*Briarwood Invs., Inc. v. Care Inv. Trust, Inc.*
  07 civ. 8159 (LLS),
  2009 U.S. Dist. LEXIS 18963 (S.D.N.Y. Mar. 4, 2009) ....................................... 28

*California Pub. Employees' Ret. Sys. v. Chubb Corp.*
  394 F.3d 126 (3d Cir. 2004) .................................................................................. 24

*City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*
  399 F.3d 651 (6th Cir. 2005) ............................................................................ 11-12

*Coronel v. Quanta Capital Holdings Ltd.*
  No. 07 Civ. 1405 (RPP),
  2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) ........................................................... 9

*Degulis v. LXR Biotechnology, Inc.*
  No. 95 Civ. 4204,
  1997 WL 20832 (S.D.N.Y. Jan. 21, 1997) ......................................................... 9, 10

*Eller Media Co. v. DGE, Ltd.*
  Nos. 83273, 83286,
  2004 WL 2002449 (Ohio App. 8 Dist. Sept. 9, 2004) ........................................... 30

*Harden v. Raffensperger, Hughes & Co.*
  933 F. Supp. 763 (S.D. Ind. 1996) ................................................................... 29-30

*Herman & MacLean v. Huddleston*
   459 U.S. 375 (1983)..................................................................................... 9, 21

*Hutchison v. CBRE Realty Fin., Inc.*
   638 F. Supp. 2d 265 (D. Conn. 2009) ........................................................ 9

*In re 2007 Novastar Fin., Inc. Sec. Litig.*
   Case No. 07-0139-cv-W-ODS,
   2008 U.S. Dist. LEXIS 44166 (W.D. Mo. June 4, 2008), ................................ 25, 28

*In re Acceptance Ins. Cos. Sec. Litig.*
   423 F.3d 899 (8th Cir. 2005) ..................................................................... 21

*In re Adams Golf, Inc. Sec. Litig.*
   381 F.3d 267 (3d Cir. 2004)...................................................................... 24, 27

*In re AFC Enters., Inc. Sec. Litig.*
   348 F. Supp. 2d 1363 (N.D. Ga. 2004) ..................................................... 26

*In re Amgen Inc. Sec. Litig.*
   544 F. Supp. 2d 1009 (C.D. Cal. 2008) .................................................... 13

*In re AXIS Capital Holdings Ltd. Sec. Litig.*
   456 F. Supp. 2d 576 (S.D.N.Y. 2006)....................................................... 16

*In re Countrywide Fin. Corp. Sec. Litig.*
   588 F. Supp. 2d 1132 (C.D. Cal. 2008) .................................................... 14, 28

*In re Direct Gen. Corp. Sec. Litig.*
   398 F. Supp. 2d 888 (M.D. Tenn. 2005)................................................... 10, 21

*In re Donald J. Trump Casino Sec. Litig.*
   793 F. Supp. 543 (D.N.J. 1992) ................................................................ 18

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*
   258 F. Supp. 2d 576 (S.D. Tex. 2003) ..................................................... 26

*In re FirstEnergy Corp. Sec. Litig.*
   316 F. Supp. 2d 581 (N.D. Ohio 2004)..................................................... 8, 29

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*
   352 F. Supp. 2d 429 (S.D.N.Y. 2005)....................................................... 11

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*
   411 F. Supp. 2d 377 (S.D.N.Y. 2006)....................................................... 27

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*
574 F.3d 29 (2d Cir. 2009) ................................................................................ 26-27

*In re Fleming Cos. Sec. & Derivative Litig.*
Civil Action No. 5-03-md-1530 (TJW),
2004 U.S. Dist. LEXIS 26488 (E.D. Tex. June 10, 2004) ..................................... 26

*In re Fuwei Films Sec. Litig.*
634 F. Supp. 2d 419 (S.D.N.Y. 2009) ................................................ 9-10, 16, 18, 27

*In re Giant Interactive Group, Inc. Sec. Litig.*
07 CIV 10588 (RWS),
2009 U.S.  Dist. LEXIS 69414 (S.D.N.Y. Aug. 5, 2009) ................................. 20, 27

*In re Hamilton Bankcorp*, Inc. Sec. Litig.
194 F. Supp. 2d 1353 (S.D. Fla. 2002) ................................................................. 26

*In re Initial Pub. Offering Sec. Litig.*
241 F. Supp. 2d 281 (S.D.N.Y. 2003) ................................................................... 15

*In re Morgan Stanley Tech. Fund Sec. Litig.*
634 F. Supp. 2d 366 (S.D.N.Y. 2009) ................................................................... 15

*In re PMA Capital Corp. Sec. Litig.*
No. 03-6121,
2005 U.S. Dist. LEXIS 15696 (E.D. Pa. July 27, 2005) ................................... 21, 24

*In re Prudential Sec. Ltd. P'ships. Litig.*
930 F. Supp. 68 (S.D.N.Y. 1996) ......................................................................... 21

*In re Sirrom Capital Corp. Sec. Litig.*
84 F. Supp. 2d 933 (M.D. Tenn. 1999) ............................................................. 8, 25

*In re Vivendi Universal, S.A.*
381 F. Supp. 2d 158 (S.D.N.Y. 2003) ................................................................... 16

*In re Washington Mut., Inc. Sec. Litig.*
No. 08-md-1919,
2009 U.S. Dist. LEXIS 41575 (W.D. Wash. May 15, 2009) ............................ 21, 28

*In re Wells Fargo Sec. Litig.*
12 F.3d 922 (9th Cir. 1993) ................................................................................. 21

*J&R Mktg., SEP v. General Motors Corp.*
549 F. 3d 384 (6th Cir. 2008) ............................................................................. 14

*Kurtzman v. Compaq Computer Corp.*
   No. Civ. A.H-99-779,
   2000 WL 34292632 (S.D. Tex. Dec. 12, 2000) ...................................................... 15

*Nolte v. Capital One Fin. Corp.*
   390 F.3d 311 (4th Cir. 2004) ...................................................................................... 16

*Rubke v. Capitol Bancorp Ltd.*
   551 F.3d 1156 (9th Cir. 2009) .................................................................................... 14

*Shapiro v. UJB Fin. Corp.*
   964 F.2d 272 (3d Cir. 1992) ....................................................................................... 21

*Sherleigh Assocs., LLC v. Windmere-Durable Holdings, Inc.*
   178 F. Supp. 2d 1255 (S.D. Fla. 2000) ...................................................................... 24

*Shields v. Citytrust Bancorp, Inc.*
   25 F.3d 1124 (2d Cir. 1994) ....................................................................................... 24

*Trendsetter Investors, LLC  v. Hyperdynamics Corp.*
   No. H-06-0746,
   2007 WL 172627 (S.D. Tex. Jan. 18, 2007) ........................................................ 19-20

*TSC Indus., Inc. v. Northway, Inc.*
   426 U.S. 438, 96 S.Ct. 2126 (1976) ........................................................................... 15

*Twinde v. Threshold Pharms. Inc.*
   No. C. 07-4972,
   2008 WL 2740457 (N.D. Cal. July 11, 2008) ............................................................ 19

*Zaluski v. United Am. Healthcare Corp.*
   527 F.3d 564 (6th Cir. 2008) ........................................................................................ 7

## Statutes

15 U.S.C. § 77k ................................................................................................................ 8
15 U.S.C. § 77k(a) ......................................................................................................... 29
15 U.S.C. § 77k(b)(3)(C) ............................................................................................... 25
15 U.S.C. § 77o .............................................................................................................. 29
15 U.S.C. § 77z-1(a)(3) ............................................................................................... 3, 4

## Rules

Fed. R. Civ. P. 8(a) .......................................................................................................... 8
Fed. R. Civ. P. 9(b) ........................................................................................................ 25
Rule 12(b)(6) .................................................................................................................. 18

Plaintiff B.H. Reagan respectfully submits this Opposition to Defendants' Motion to Dismiss the Complaint.[1]  For the reasons set forth herein, this Motion should be denied.

## PRELIMINARY STATEMENT

This is a class action on behalf of all current and former National City Corporation ("National City" or the "Company") shareholders who acquired National City common stock pursuant and/or traceable to National City's registration statement filed with the Securities and Exchange Commission ("SEC") in connection with National City's acquisition of Fidelity Bankshares (the Registration Statement). Plaintiff's Complaint adequately alleges violations of § 11 of the Securities Act of 1933 (the "Securities Act"), and control person liability pursuant to § 15 of the Securities Act. Plaintiff has alleged he acquired the common stock of National City pursuant or traceable to the Registration Statement, which contained materially false or misleading statements and omissions; that the Registration Statement was signed by each of the Individual Defendants; and has alleged each Individual Defendant's position in the Company or on the Board of Directors and their ability to control the content and issuance of the Registration Statement. Nothing more is required to plead _prima_ _facie_ claims pursuant to §§ 11 and 15 of the Securities Act, and the Defendants have offered no legitimate substantive grounds for dismissing Plaintiff's Complaint.

Defendants' motion is primarily based upon self-serving mischaracterizations of the Complaint and cases involving securities fraud claims which have no application to a § 11 claim. Defendants assert the Complaint seeks to hold them liable for "hindsight" falsity. That is not what Plaintiff has alleged. Rather, Plaintiff alleges that Defendants failed to disclose and made false or misleading statements about: the quality (or lack thereof) of National City's loan

---

[1]  All references to "¶___" are to paragraphs in the Complaint.

portfolio; the length of the period after which National City would declare loans nonperforming; and that National City's loan loss reserves were "adequate" and based on "current economic events." Plaintiff alleges that each of these statements was false or misleading at the time it was made, why it was false or misleading based on then-existing facts and, of no less importance, how each of these statements rendered National City's financial statements false and misleading, thus distorting the financial condition of National City. Under § 11, the issuer's liability for such false and misleading statements is "virtually absolute."

Defendants further offer theories as to what caused the downfall of National City and the deterioration of its stock price; try to deflect responsibility onto National City's auditors; assert inapplicable "specificity" arguments; and contend the Registration Statement "cautioned" that National City's reserves "might" turn out to be "off the mark." Defendants' arguments must fail, first and foremost, because such arguments are properly raised at trial or by summary judgment motion, not on a motion to dismiss. Damages that are apparent on the face of the Complaint are presumed under § 11. Defendants' negative causation argument is an affirmative defense not properly resolved on a motion to dismiss. The same is true for Defendants' "reliance on audited financial statements" defense. Moreover, as noted below, the "cautionary" statement on which Defendants rely cannot shield them from liability when it falsely characterized events and circumstances as a risk that "may" occur when the matters complained of were actually existent and occurring at the time the Registration Statement was issued. In any event, the "bespeaks caution" doctrine has no application here, as that doctrine applies only to forward looking statements, not to statements of existing fact such as those identified in the Complaint. Finally, Defendants' argument that Plaintiff has failed to plead with sufficient specificity hinges on both a misconception that Plaintiff must plead "specific culpable deficiencies" in National City's loan

loss methodologies, as well as an inapposite securities fraud case. The claims asserted herein arise under § 11 of the Securities Act, which imposes liability for misrepresentations and omissions in a registration statement regardless of whether the Defendants acted with scienter and regardless of Plaintiff's reliance thereon. Rule 9(b)'s specificity requirements are inapplicable, and Defendants' argument is unfounded. Accordingly, and for the reasons discussed herein, the motion to dismiss should be denied.

## **PROCEDURAL HISTORY**

On August 26, 2008, Plaintiff Reagan brought the instant action by filing a class action complaint in the Circuit Court for Palm Beach County, Florida.  The claims asserted by Plaintiff arise solely under §§ 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o.

On September 26, 2008, Defendants removed this action to the U.S. District Court for the Southern District of Florida.  Defendants simultaneously filed a motion with the Judicial Panel on Multidistrict Litigation ("JPML") to transfer this case to the Northern District of Ohio for coordinated pretrial proceedings.  On November 26, 2008, over Plaintiff Reagan's opposition, this action was transferred to the Northern District of Ohio.  Thereafter, the parties agreed upon a briefing schedule for responding to the complaint and, on October 8, 2009, this Court entered an Order modifying this briefing schedule.  In accordance with that Order, on November 9, 2009, Defendants filed a motion to dismiss the complaint and Plaintiff Reagan hereby submits this memorandum in opposition to Defendants' motion to dismiss. [2]

---

[2] Defendants attempt to call into question Reagan's characterization of the complaint as one brought on behalf of a class, noting that Reagan has not sought appointment as lead plaintiff under the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 77z-1(a)(3).  Defendants' Brief ("Def. Br.") at 5 FN6. Defendants, however, fail to mention the fact that a stay order barred Reagan from filing such a motion.  On October 8, 2008, Judge Hurley of the U.S. District Court, Southern District of Florida, entered an Order staying this action pending a determination by the JPML as to whether the case should be transferred to the Northern District of Ohio.  Reagan filed a Motion for Reconsideration of the Order requesting, among other things, that the stay be temporarily lifted so that Reagan could file a motion seeking lead plaintiff status.  Defendants opposed lifting the stay and, on October 15, 2008, the Court entered an Order denying Reagan's Motion for Reconsideration.  As such, Reagan was unable to file a lead plaintiff

## STATEMENT OF FACTS

**I.      Background of Fidelity Acquisition**

On July 27, 2006, National City and Fidelity announced that they had reached a definitive agreement for National City to acquire Fidelity ("Fidelity Acquisition").  ¶26.  At the time, Fidelity, headquartered in West Palm Beach, Florida, was the fourth largest publicly traded banking institution based in Florida with $4.2 billion in total assets and 52 branches along Florida's east coast.  *Id.*  Under the terms of the agreement, Fidelity stockholders could elect to receive $39.50 in cash or 1.0977 shares of National City common stock subject to allocation procedures that would allow 50% of the Fidelity outstanding shares to receive cash and 50% to receive stock.  *Id.*  The value of the acquisition based on the then current value of National City stock was approximately $1 billion.  *Id.*  Plaintiff B.H. Reagan acquired 17,981 shares of National City common stock in exchange for his Fidelity shares in the Fidelity Acquisition.

On September 18, 2006, National City filed a preliminary registration statement with the SEC on Form S-4, subsequently amended on October 12, 2006 (collectively referred to as the "Registration Statement"),[3] for approximately 14.5 million National City common shares to be exchanged for Fidelity common stock in connection with this acquisition.  ¶27.  On January 8, 2007, National City announced the completion of its acquisition of Fidelity, effective January 5, 2007.  ¶26.

---

motion without violating the Court's stay order.  *See* 15 U.S.C. § 77z-1(a)(3).  Moreover, Reagan recently filed a motion seeking lead plaintiff status, which is currently unopposed.  As such, any alleged deficiency has been cured.
[3]  The Registration Statement incorporated by reference the following documents that have previously been filed with the SEC by National City: Annual Report on Form 10-K for the year ended December 31, 2005; Quarterly Reports on Form 10-Q for the quarters ended March 31, 2006 and June 30, 2006; Current Reports on Form 8-K dated January 17, March 14, March 17, April 18, May 1, June 14, July 10, July 11, July 18, July 27, September 5, September 6, and September 14, 2006; and Definitive Proxy Statement filed on March 8, 2006.  ¶28.  The Registration Statement also stated that it was incorporating by reference "any document they may file under Sections 13(a), 14, or 15(d) of the Securities Exchange Act of 1934, as amended, after the date of this proxy statement/prospectus and prior to the date of the Fidelity Bankshares special meeting."  *Id.*  All references to statements made in the Registration Statement include statements contained in the above-listed documents.

4

## II.     The 2007-2008 Mortgage and Real Estate Crisis *Exposes* the Materially Misleading Statements and/or Omissions in the Registration Statement

### A.     National City's Subprime Construction Loans

The Registration Statement represented that mortgage loans produced by National City's Mortgage Division ("NCM") were prime, conforming mortgages.[4]  ¶32, 35-36, 38-39.  In reality, however, NCM originated billions of dollars of risky, subprime construction loans.  ¶¶ 29, 33-34, 40-43.  On September 6, 2007, during an analyst conference call, National City revealed it had construction loans with subprime characteristics (i.e., "no money down" and high loan-to-value ("LTV") ratios) on its books.  ¶41-42.  In fact, Defendants admitted that the construction loans constituted a "serious product deficiency" and that "bad product design" had exposed them to a high likelihood of default and extreme loan loss severity.  ¶¶33-34, 41-43, 46-53.  The "bad product design" of these loans made it more likely that borrowers would default if property prices declined and also exposed the Company to increased risks of loss from these loans.  ¶¶ 33-34, 41-43, 49-54.

### B.     National City's Mischaracterization of Nonperforming Loans

National City mischaracterized its policy with respect to when it designated loans as nonperforming.  Specifically, the Registration Statement stated that National City designated loans as nonperforming "when either principal or interest payments are 90 days or more past due."[5]  ¶57.  Unbeknownst to investors, however, National City was actually waiting until loans had been delinquent for 180 days before classifying them as nonperforming.  ¶59.

---

[4] Conforming mortgages are mortgages made in accordance with certain quality standards required by government-sponsored enterprises.

[5] A delinquent loan, where the borrower has failed to make payments required under the terms of the mortgage, is classified as "nonperforming" after a designated amount of time has passed since the borrower stopped making payments.  ¶56.  Once the loan has been nonperforming for a certain amount of time, a loss is recognized by applying a "charge-off" in the amount of the loss against the loan loss reserve.  *Id.*  The amount of nonperforming loans is a key indicator of a lender's credit risks and the financial impact from those risks, *i.e.,* defaults and loan losses.  *Id.*

As a result of this misrepresentation, the Company's residential real estate loans appeared to be performing significantly better than they were.  ¶61.  Moreover, this undisclosed practice of waiting 180 days, as opposed to 90 days, concealed hundreds of millions of nonperforming loans from investors and caused a number of material line-items, such loan losses and reserve-to-nonperforming loan ratio, in the Company's quarterly financial statements to be materially false and misleading.  ¶¶61-64.

### C.     National City's Understated Loan Loss Reserves

A loan loss reserve or allowance is an amount set aside by a company to absorb losses from bad loans.  ¶65.  In the Registration Statement, National City stated that its loan loss allowances were adequate and based, among other things, on "current economic events" and current risk characteristics of the loan portfolio.  ¶66.  Unbeknownst to investors, however, National City was not tying its loan loss reserves to *current* economic events but instead was basing its reserves on *past* events.  ¶¶67-69.  More specifically, on January 22, 2008, the Company significantly increased its loan loss reserve due to the inclusion of "estimated probable credit losses within the loan portfolio that have not yet reached charge-off thresholds."  ¶¶67-68.

As such, the Company's past practice had been to tie its provisioning for loan loss reserves to current charge-off levels, which is a lagging, rather than leading, indicator of loan losses. ¶¶68-69.  The effect of tying reserves to current charge-offs produced a time lag between "current economic events" and the loss reserves since the reserves were being established for loans that had already been in trouble for some time as opposed to loans that were showing early signs of distress.  ¶69.  Thus, by basing reserve provisioning levels on already depressed charge-off levels, the Company was not reserving for current economic events but rather for events that had occurred well in the past.  *Id.*

III.    **Subsequent History**

On August 26, 2008, Plaintiff filed the instant complaint.  Thereafter, National City was acquired by PNC Financial Services Group Inc. ("PNC") in a forced sale.  On October 25, 2008, National City and PNC announced that they had signed a definitive agreement for PNC to acquire National City for $2.23 per share and, on December 31, 2008, this acquisition was completed.[6]

## ARGUMENT

I.    **LEGAL STANDARDS APPLICABLE TO A MOTION TO DISMISS**

Defendants have moved to dismiss the Complaint in its entirety under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  When evaluating a complaint in light of a motion to dismiss, a court must accept all of the plaintiff's well-pled allegations as true and resolve every doubt in favor of the plaintiff.  *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 570 (6th Cir. 2008) ("In reviewing a Rule 12(b)(6) motion to dismiss, [we treat] all well-pleaded allegations in the complaint as true, and [we] find dismissal proper only if it appears beyond doubt that the plaintiff can prove no set of facts in support of the claims that would entitle him or her to relief.") (internal citation omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Moreover, "when a complaint adequately states a claim, it may not be dismissed based on a district court's

---

[6] *See* October 24, 2008 Press Release entitled "PNC to Acquire National City," attached to the Declaration of Michael J. Pucillo ("Pucillo Decl.") as Exhibit 1.  *See also* December 31, 2008 Press Release entitled "PNC Completes Acquisition of National City," attached as Exhibit 2 to the Pucillo Decl.

assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." *Twombly*, 127 S. Ct. 1955, 1969 (2007).

## II.     THE COMPLAINT ADEQUATELY STATES A CLAIM UNDER SECTION 11

### A.     Section 11 Liability

Section 11 of the Securities Act imposes civil liability on issuers and signatories of a registration statement that "contained an untrue statement of a material fact or omitted to state a material fact… necessary to make the statements therein not misleading."  15 U.S.C. § 77k.  "A number of courts have held that the particularity requirement of Rule 9(b) does not apply to Section 11 or Section 12 claims because proof of fraud or mistake is not a prerequisite to establishing liability under those statutes."  *In re Sirrom Capital Corp. Sec. Litig.*, 84 F. Supp. 2d 933, 937 (M.D. Tenn. 1999).  It is only when a plaintiff's claims are premised on allegations of fraud, that Rule 9(b) has any application.  *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 602 (N.D. Ohio 2004).

Where, as here, Plaintiff's claims are clearly not fraud-based, Rule 9(b) does not apply and Plaintiff's claims are governed by Rule 8(a).  In this case, Plaintiff has explicitly averred that the claims being brought are not premised on fraud.[7]  *See, e.g., In re FirstEnergy*, 316 F. Supp. 2d at 602 (holding that Rule 8 applies because Plaintiffs explicitly disclaimed that claims brought under §§ 11 or 15 of the Securities Act were premised on any allegations of fraud).  Given that Rule 8 only requires a "short and plain statement of the claim," Plaintiff has easily satisfied its requirements.  Fed. R. Civ. P. 8(a).

Defendants assert that a relevant inquiry for this Court to make in evaluating Plaintiff's

---

[7]  *See, e.g.,* ¶¶89, 104 (With respect to the claims brought by Plaintiff (both Section 11 and 15), "Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this action is based solely on claims of strict liability and/or negligence under the Securities Act").

§ 11 claim is "'whether the facts alleged in the Complaint evince that the Company knew or had reason to believe, at the time the Prospectus and Registration Statement were filed, that the Statement was *untrue*.'" Def. Br. at 8 (quoting *Coronel v. Quanta Capital Holdings Ltd.*, No. 07 Civ. 1405 (RPP), 2009 WL 174656, at *13 (S.D.N.Y. Jan. 26, 2009) (emphasis not in original)). Other courts, however, including those in the Second Circuit, have held otherwise.  In fact, the Supreme Court in *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983), specifically stated that, "[i]f a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case.  Liability against the issuer of a security is virtually absolute, *even for innocent misstatements.*" (emphasis added).

Another district court in the Second Circuit *refused* to apply this specific "did the securities issuer know or have reason to know" standard, stating, "[u]nder current prevailing law, however, securities issuers do appear to be subject to strict liability with regard to material misstatements and omissions, regardless of whether the material omitted facts were known or knowable or not."  *Hutchison v. CBRE Realty Fin., Inc.*, 638 F. Supp. 2d 265, 273-74 (D. Conn. 2009).  The Court in *Hutchison*, cited the Supreme Court's decision in *Herman & Maclean v. Huddleston*, as well as other district court decisions "within and outside the Second Circuit," 638 F. Supp. 2d at 274, including, *Degulis v. LXR Biotechnology, Inc.*, No. 95 Civ. 4204, 1997 WL 20832, at *3 (S.D.N.Y. Jan. 21, 1997) ("[I]n this Circuit there is no serious question that sections 11 and [12(a)(2)] impose[d] strict liability from materially false statements or omissions .... [T]o make out a *prima facie* case at the pleadings stage, Plaintiffs need only allege a material misstatement or omission.  Neither knowledge nor reason to know is element of a plaintiffs' *prima facie* case.").  *See also, In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 441 n. 15

9

(S.D.N.Y. 2009) ("Defendants argue that it is 'unreasonable' to assume that Defendants possessed this knowledge at the time of the IPO. ...  This argument is unavailing.  As noted above, knowledge is not an element of a plaintiffs' *prima facie* case for claims brought pursuant to sections 11 and 12(a)(2). ...  Accordingly, Defendants' 'knowledge' argument is more appropriately made on a motion for summary judgment, in the context of invoking the various 'due diligence' or 'reasonable care' affirmative defenses provided for by sections 11 and 12(a)(2).") (citing *Degulis*); *Arkansas Pub. Employee Ret. Sys. v. GT Solar Int'l,* Civil No. 08-cv-312-JL, 2009 U.S. Dist. LEXIS 93820, at *19-21 (D.N.H. Oct. 7, 2009) ("'[N]either knowledge nor reason to know is an element in a plaintiff's *prima facie* case' under §§ 11 or 12(2) of the Securities Act. ... So the defendants' point about what the plaintiff has not alleged they knew is irrelevant to whether the complaint adequately states claims against them under §§ 11 and 12.") (quoting *Degulis* and citing cases); *In re Direct Gen. Corp. Sec. Litig.*, 398 F. Supp. 2d 888, 901 (M.D. Tenn. 2005) ("On a Section 11 claim, Plaintiffs need not show that the [] Defendants knew their statements were false or misleading").

> **B.**    **National City's Registration Statement Contained False and Misleading Statements and Omissions**

The Complaint sets out the specific statements in the Registration Statement issued in connection with the Fidelity Acquisition and explains why each statement was false. *See, e.g.,* ¶¶35-49, 57-60, 62-64, 66-69, 71-80.  The Registration Statement falsely assured investors that NCM originated prime, conforming mortgages in accordance with strict underwriting standards. In reality, as explained in detail throughout the Complaint, NCM originated risky, subprime loans that were nonconforming.  The Complaint further explains, in detail, that the Registration Statement misled investors with respect to National City's policy for recording loans as "nonperforming," causing the Company's residential real estate loan portfolio to appear to be

performing significantly better than it actually was.  The Registration Statement also falsely

reassured investors that the Company was adequately reserving for loan losses based on then-

existing economic events despite the fact that, in reality, the Company was not taking into

account signs of early loan distress.  Finally, the Complaint identifies the specific financial

results reported by National City that were untrue as a result of these false and misleading

statements and/or omissions.[8]

Although Defendants argue that Plaintiff's allegations are insufficient because the

Complaint pleads falsity or "misleadingness" by hindsight, this is simply not true.  Def. Br. at 8,

12-13, 20-23.  Unlike the cases relied upon by Defendants, the allegations in the Complaint do

not require inferential leaps and are not premised on mere speculation.  *See, e.g., In re Flag*

*Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 448 (S.D.N.Y. 2005) (discussing

inferential leap required to make certain statements false and misleading); *Belodoff v. Netlist,*

*Inc.*, CV 07-00677, 2008 WL 2356699, at *13 (C.D. Cal. May 30, 2008) (dismissing § 11

claims, finding that allegations of channel stuffing "does not rise above speculation as to the

causes of a decline in revenue").  Instead, the Complaint, as it must, alleges why the challenged

statements were false - *at the time they were made* - and why the asserted omissions should have

been made earlier in light of *then-existing* facts.  The basis of Plaintiff's claims is that the

statements in the Registration Statement misstated the quality of NCM's loan portfolio,

misrepresented when the Company was conferring "nonperforming" designations to residential

real estate loans, and falsely reassured investors about National City's policy for establishing

loan loss reserves.  *See, e.g., City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d

---

[8]  Defendants' argument that Plaintiff's false financial statements claim is somehow derivative of Plaintiff's other claims, *see* Def. Br. at 23, is nonsensical.  The nexus of Plaintiff's claims is that Defendants issued materially false and misleading statements, including but not limited to, false financial statements in the Company's Registration Statement.  These allegations are in no way derivative of other claims asserted in the Complaint.

651, 680 (6th Cir. 2005) (rejecting defendant's "fraud by hindsight" argument, noting that "it is no answer to say [the problems] were eventually disclosed later in time" as evidence that the complaint advanced an impermissible theory of liability).

### 1.    The Complaint Adequately Pleads Actionable Misstatements Regarding Loans Originated By NCM

The Complaint identifies several statements in the Registration Statement that presented NCM as a prime mortgage lender that originated conforming loans in accordance with strict underwriting standards.  For example, the Registration Statement explicitly held NCM out as National City's "prime mortgage unit," stressed that NCM's "residential real estate production is primarily originated in accordance with underwriting standards set forth by the government-sponsored entities…" and noted that "[t]hese loans…*have loan-to-collateral ratios of 80% or less, and are made to borrowers in good credit standing*…."  ¶¶35-36.[9]  Moreover, the Registration Statement stated that NCM "*primarily originates conventional* residential mortgage and home equity loans," contrasting NCM with the Company's First Franklin unit, which was responsible for producing National City's nonconforming mortgages.  ¶¶36-37.  Similarly, the Company represented NCM's output to be prime, conforming mortgages, noting "Mortgage loans originated by NCM generally represent loans collateralized by one-to-four-family residential real estate and are made to borrowers in good credit standing.  *These loans are typically sold to primary mortgage market aggregators*…."  ¶38.  A September 5, 2006 press release (filed on Form 8-K with the SEC and incorporated into the Registration Statement), further stated that NCM "*[was] our prime mortgage subsidiary....*"  ¶39.

Those statements were false.  As discussed above, the Complaint alleges numerous facts that establish that NCM originated more than $3 billion of construction loans, all of which were

---

[9]  Unless noted otherwise, all emphases has been added and does not appear in the original.

nonconforming and many of which featured the worst qualities of subprime, such as "stated" income documentation, with no down payment or extremely high LTV ratios of as much as, and even higher than, 95%.  ¶40.  In fact, NCM's loan origination standards were so lax that the Company later admitted that NCM's construction loans to be a "product deficiency" and so poorly designed that, when real estate prices dropped, borrowers' only rational economic decision was to default and walk away.  ¶¶41-43.  These loans were so poorly underwritten that the loans experienced losses of 50-95% on those that defaulted, causing the Company to recognize enormous losses from these loans.  ¶¶49-53.

In the face of these clear allegations that the Registration Statement misstated the quality of NCM's loans, Defendants argue that the Complaint fails to allege a contemporaneously false or misleading statement about the construction loans.  Defendants first argue that they disclosed the nature and quality of the construction loans since National City never represented that "*all* loans originated by NCM were prime, conforming mortgages."  Def. Br. at 9.  Rather, Defendants allege that by using qualifying terms such as "primarily" and "generally" to describe NCM's prime loan origination, the Registration Statement accurately portrayed the nature and quality of construction loans originated by NCM.  Def. Br. at 9-10.  But these qualifying terms are themselves false and misleading since they fail to disclose that *substantially all* of the construction loans originated by NCM were subprime, nonconforming loans.  *See, e.g., In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1034 (C.D. Cal. 2008) (in denying defendants' motion to dismiss, finding "[i]ncomplete statements are misleading if they affirmatively create an impression of a state of affairs which differs in a material way from the one that actually exists.") (internal citation omitted).  By stating that NCM primarily originated prime, conforming

mortgages, Defendants represented that NCM was a prime loan originator when, in fact, it was not.

Defendants further state that there was no recognizable "product design" problem with the construction loans when the allegedly false and misleading statements were made and that the product deficiency only occurred *because of* the subsequent dislocations in the real estate market. Def. Br. at 10-11. This argument misses the point entirely. The construction loans did not *become* poorly designed due to the decline in the real estate market, the decline merely exposed them as such.[10] *See, e.g., In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1174 n. 53 (C.D. Cal. 2008) (noting that "[j]ust as the Court could take judicial notice of the fact that the country suffered from the Great Depression in the 1930s, the Court cannot use that fact to infer anything in particular about a business operating at the time.") (internal citation omitted).

Defendants further argue that Plaintiff has failed to identify a duty to disclose the "bad product design" of the construction loans. Def. Br. at 11-12. This argument mischaracterizes the claim originally made. The Complaint alleges that Defendants had a duty to disclose the subprime, nonconforming nature of the construction loans in order to make the statements, discussed above, not false and misleading. *See, e.g., J&R Mktg., SEP v. General Motors Corp.*, 549 F. 3d 384, 390 (6th Cir. 2008) (stating that a duty to disclose exists in order to "make another statement…not misleading.") The Complaint points to the Company's subsequent

---

[10]  Defendants rely on *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156 (9th Cir. 2009) to support their claim that there was no recognizable "product design" problem with the construction loans when the false and misleading statements were made. This case is easily distinguishable. First, unlike this case, the plaintiffs in *Rubke* were subject to the heightened pleading requirements of Rule 9(b). Moreover, the plaintiffs in *Rubke* brought claims based on potentially deceptive telephone calls that occurred *after* the registration statement became effective. *Id.* at 1164. The Court found that defendants "could not know on the effective date of the registration statement that board members [] would engage in potentially deceptive telephone calls later that month…." *Id.* Plaintiff in this case, however, is not premising his claims on events that occurred *after* the Registration Statement became effective but, instead, on facts that existed contemporaneously with the Registration Statement.

admission that the construction loans constituted a "serious product deficiency" and were a "bad product design" as further evidence that, contrary to Defendants' statements, the origination standards of the construction loans were not consistent with prime, conforming mortgages.  By holding NCM out as an originator of prime, conforming mortgages, Defendants had a duty to disclose that substantially *all* of the construction loans in NCM's portfolio were actually highly risky, subprime mortgages that contained a high likelihood of default and extreme loan loss severity.  *Kurtzman v. Compaq Computer Corp.*, No. Civ. A.H-99-779, 2000 WL 34292632, at *22 (S.D. Tex. Dec. 12, 2000) ("It is well settled that once a company makes a disclosure, even if it is literally true, the company is under 'a duty to speak the full truth.'") (internal citation omitted).  As such, Defendants' allegation that Plaintiff "does not identify the source of any duty to disclose" is simply not true.[11]

Finally, Defendants argue that "plaintiff suggests that the Registration Statement culpably failed to disclose the ultimate magnitude of losses that National City ended up incurring specifically on its construction loan portfolio" and, similarly, that the Complaint "criticizes National City for not having broken out the residential construction loans as a separate category for tabular presentation."  Def. Br. at 12-13.  This is a misinterpretation of the allegations in the Complaint and of the law.  The Complaint alleges the magnitude of the losses incurred by National City with respect to construction loans as evidence that Defendants' misrepresentations were clearly material.[12]  Plaintiff need not make a showing of "culpable participation" as his

---

[11] The case that Defendants rely on, *In re Morgan Stanley Tech. Fund Sec. Litig.*, 634 F. Supp. 2d 366, 380-82 (S.D.N.Y. 2009), is similarly unavailing since, unlike here, the omitted information did not render the statements made by defendants misleading.  Here, as already discussed above, Plaintiff has identified statements in the Registration Statement that were rendered misleading through Defendants' failure to disclose the subprime nature of the construction loans in NCM's loan portfolio.

[12] Since the question of whether a particular statement or omission is material is a "mixed question of law and fact," the issue of materiality is not usually one that can be resolved at the motion to dismiss stage.  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 2132-33 (1976); *see also In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 379 (S.D.N.Y. 2003) ("The question of materiality is rarely amenable to disposition as a matter of

claims are brought under §§ 11 and 15 of the Securities Act.  *See, e.g., In re Vivendi Universal, S.A.,* 381 F. Supp. 2d 158, 187-88 (S.D.N.Y. 2003) ("'Because the underlying violation pursuant to section 15 is a violation of section 11 and 12(a)(2) in which strict liability is imposed ( *i.e.,* knowledge of the misrepresentation is not required), this Court agrees with those district courts that have held that [culpable participation is not an element] required to establish a *prima facie* case of control person liability pursuant to section 15.'") (internal citation omitted); *In re Fuwei Films,* 634 F. Supp. 2d at 435 ("[P]laintiff is not required to allege culpable participation…to state a claim under Section 15.") (internal citation omitted).

Moreover, Defendants' argument that there was no accounting or reporting requirement that required National City to break out construction loans as a separate line item in the Registration Statement equally misses the mark: there is no specific allegation in the Complaint stating that Defendants were required to separately break out construction loans as a separate line item.[13]  Rather, their duty was to accurately portray the quality of loans held by NCM which, as already discussed above, they did not do.

### 2.    The Complaint Adequately Pleads Actionable Misstatements Concerning National City's Nonperforming Loans

In addition to misstating the quality of NCM's loan portfolio, the Registration Statement also contained untrue statements concerning National City's policy for classifying loans as nonperforming.  For example, the Registration Statement represented that loans would be designated as nonperforming based on the following policy: "[c]ommercial loans and leases and *loans secured by real estate* are designated as nonperforming when either principal or interest

---

law.").  Although Defendants "pass on" arguing whether NCM's construction loan portfolio is *per se* immaterial, Def. Br. at n. 7, the real reason why this argument was not made is because courts properly give deference to the trier of fact on questions involving materiality.  Plaintiff has plainly alleged materiality as to Defendants' false statements regarding the quality of the loan portfolio.

[13] As the Complaint contains no such allegation, the cases that Defendants cite are not on point.  *See, e.g., Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 316 (4th Cir. 2004) and *In re AXIS Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576 (S.D.N.Y. 2006).

payments are **90 days or more** past due…."  ¶57.  Moreover, the Registration Statement further misrepresented the amount of "nonperforming" residential real estate loans in its portfolio.  ¶58.

Those statements were untrue because National City was instead waiting until residential real estate loans had been delinquent for at least 180 days before labeling them as nonperforming, causing the Company's residential real estate loans to appear to be performing significantly better than they were.  ¶¶59-61.  The Company's misrepresentation of its nonperforming loans also caused National City to appear better reserved than it actually was, and allowed the Company to delay taking "charge offs," or losses, on its bad loans.  ¶¶62-64.

Defendants argue that Plaintiff has "distorted" National City's policy for classifying residential real estate loans as nonperforming by quoting from the Company's "wholly separate" policy that deals only with *commercial* real estate loans.  Def. Br. at 14.  In view of the plain language of the above-quoted policy, this argument is nonsense.  The plain language of the policy states that it applies to commercial loans **and** to loans secured by real estate.  ¶57.  To read that the Company's 90-day policy applied solely to commercial loans would require an investor to read the following statement "and loans secured by real estate" as superfluous and meaningless.  In fact, when the Company intended to differentiate between commercial real estate loans and residential real estate loans in the Registration Statement, it did so.  For instance, in the paragraph immediately following National City's policy with respect to nonperforming loans, the Registration Statement stated the following with respect to its policy for recognizing losses on loans:

> Nonperforming commercial loans and leases and **commercial loans secured by real estate** are generally charged off to the extent principal and interest due exceed the net realizable value of the collateral, with the charge-off occurring when the loss is reasonably quantifiable but not later than when the loan becomes 180 days past due. **Loans secured by residential real estate** are generally charged

> off to the extent principal and interest due exceed 90% of the current appraised value of the collateral and the loan becomes 180 days past due.
>
> *See* Feb. 6, 2006 Form 10-K, Att. 2 to the Declaration of Geoffrey J. Ritts, Doc. No. 25-2, at 82.

As such, the Company's failure to differentiate between commercial versus residential real estate loans when discussing its 90-day policy indicates that this policy applied to *all* loans, not just commercial.[14]

Defendants also argue that the Registration Statement and incorporated filings "made abundantly clear that National City did not classify its 90-day-delinquent residential real estate policy as nonperforming" since these filings provided separate tabular reports for 90-day-delinquent versus nonperforming loans. Def. Br. at 14-15. Courts have held, however, that a prospectus violates Section 11 "if it does not disclose material objective factual matters, or buries those statements beneath other information, or treats them cavalierly." *In re Fuwei Films,* 634 F. Supp. 2d at 440 (internal citation omitted)(denying, in part, motion to dismiss Section 11 and 15 claims). The tabular reports that Defendants point to as alleged disclosures are buried beneath the Company's clear policy indicating that loans secured by real estate were designated nonperforming after 90 days of nonpayment. Moreover, the tabular reports do not indicate that, contrary to Defendants' statements, the Company was following a different policy with respect to residential versus commercial real estate loans. As such, National City did not "affirmatively disclose" that National City was not following a 90-day policy for classifying residential real estate loans as nonperforming.[15]

---

[14] At most this argument presents a factual question that cannot be resolved under Rule 12(b)(6).

[15] Defendants' reliance on *In re Donald J. Trump Casino Sec. Litig.*, 793 F. Supp. 543, 556 (D.N.J. 1992) in an attempt to characterize Plaintiff's claim as "fraud by hindsight" and "Monday morning quarterbacking" is not on point since Plaintiff is not alleging that the Company's statements became false and misleading when National City decided to change its policy in 2008. Rather, Plaintiff alleges that the challenged statements were false *at the time they were made* in the Registration Statement since, at that time, the Company misrepresented its policy concerning nonperforming loans.

3.      **The Complaint Adequately Pleads Actionable Misstatements Concerning Loan Loss Reserves**

Plaintiffs also allege that the Registration Statement materially misstated the Company's policy regarding loan loss allowances by tying its loss reserves to events in the past rather than to current economic events and conditions.  ¶¶66-69.  More specifically, in the Registration Statement, National City falsely stated that its reserve for loan losses was based on "current" risk characteristics of the loan portfolio and "current economic events."  ¶66.

These statements were false since National City was actually tying its loss reserves to past – not present – economic events.  ¶¶67-69.  More specifically, on January 22, 2008, the Company disclosed that it was forced to increase its loan loss reserve "to reflect estimated probable credit losses within the loan portfolio that have not yet reached charge-off thresholds." ¶67.  This disclosure revealed that, prior to this time, the Company was tying its reserves to current charge-offs, a lagging, rather than leading, indicator of loan losses.  As such, the Company was not reserving for loan losses based on "current economic events" but rather was tying its reserves to events that had occurred more than 180 days earlier.  ¶¶68-69.

In the face of these clear allegations that National City understated its loan loss reserves, Defendants argue that the conflict in policies is "wholly manufactured" and that the two policies are "substantively identical" to one another.  Def. Br. at 17-19.  This argument ignores the plain language of the Company's January 22, 2008 disclosure and begs the questions as to why, if the Company had been tying its reserves in the past to loans that had not yet reached charge-off levels, the Company had to increase its loan loss reserve (by *$691 million* on January 22, 2008 and by *$1.39 billion* on April 21, 2008) to reflect these poorly performing loans if the Company was already doing so.  Lastly, the cases that Defendants cite to, *Twinde v. Threshold Pharms. Inc.*, No. C. 07-4972, 2008 WL 2740457 (N.D. Cal. July 11, 2008) and *Trendsetter Investors,*

*LLC v. Hyperdynamics Corp.*, No. H-06-0746, 2007 WL 172627 (S.D. Tex. Jan. 18, 2007), are wholly distinguishable from the case at hand since both of those cases involved complaints that relied on misquoted statements.  Plaintiff here has not misquoted what National City said in either the Registration Statement or in the January 22, 2008 press release and, as such, these cases are not on point.

Moreover, Defendants' arguments that Plaintiff simply alleges, solely with the benefit of "hindsight," National City's loan loss reserve "was too low," that loan loss reserves are simply predictions not actionable under the federal securities laws; and that Plaintiff must allege "specific culpable deficiencies" in National City's loan loss methodologies, Defs' Br. at 20-22, misrepresent both Plaintiff's Complaint and the applicable case law.

### a)  Affirmative Misrepresentations

Contrary to Defendants' assertions, Plaintiff alleges that the Registration Statement *affirmatively misrepresented* the adequacy of National City's loan loss reserves.  *See* ¶66 ("The allowance for loan losses is maintained at a level believed adequate by management to absorb probable incurred losses within the loan portfolio and is based on the size and current risk characteristics of the loan portfolio ... current economic events ... and general economic conditions.").  Moreover, Plaintiff alleges contemporaneous facts showing this affirmative statement was false.  *See, i.e.,* ¶69 ("[B]y basing revenue provisioning levels on already depressed charge-off levels, the Company was not in fact reserving for 'current economic events ... and ...  conditions,' but rather for the conditions approximately half a year in the past.").[16]  In any event, the truth or alleged falsity of Defendants' statements "cannot be decided on a motion

---

[16] Thus, Defendants' claim that the Registration Statement "cautioned" that the reserves "might" turn out to be "off the mark," Defs' Br. at 20-21, must fail given that the warning said nothing about the risk that the reserves were insufficient from the get go.  *In re Giant Interactive Group, Inc. Sec. Litig.*, 07 civ 10588 (RWS), 2009 U.S. Dist. LEXIS 69414, at *18 (S.D.N.Y. Aug. 5, 2009) (where Registration Statement did not specifically address the

to dismiss," and "are more properly suited for a motion for summary judgment."  *In re Direct General*, 398 F. Supp. 2d at 897.[17]

> b) *Misstatements Regarding Loan Loss Reserves are Actionable Under the Federal Securities Laws*

Misstatements regarding loan loss reserves are clearly actionable under the federal securities laws.  *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281 (3d Cir. 1992) ("There is nothing unique about representations and omissions regarding loan loss reserves that removes them from the purview of the antifraud provisions of the federal securities laws.").  *See also In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 929-30 (9th Cir. 1993) (finding statement that "[t]he Company considers the allowance for loan losses of $885.4 million adequate" actionable "factual statement" under Section 10(b) of the Exchange Act of 1934).  Of greater significant to this case, such statements are also actionable under the Securities Act.  *In re Washington Mut., Inc. Sec. Litig.*, No. 08-md-1919, 2009 U.S. Dist. LEXIS 41575, at *51 (W.D. Wash. May 15, 2009) (since "allegations of misstatements regarding loan loss reserves are actionable under the Exchange Act .... It follows that such allegations are also actionable under the more permissive pleading standards of the Securities Act") (citing *Herman and MacLean*, 459 U.S. at 382; *In re Wells Fargo Sec. Litig.*, 12 F.3d at 926)); *In re PMA Capital Corp. Sec. Litig.*, No. 03-6121, 2005 U.S. Dist. LEXIS 15696, at *48 (E.D. Pa. July 27, 2005) (management's belief that loan loss reserves were "fairly stated" gave rise to claim under the Securities Act).

---

alleged problem, "Defendants have raised a factual issue as to the adequacy of the disclosures that cannot be resolved on this motion to dismiss.").  Similarly, Defendants cannot avail themselves of the judicially created "bespeaks caution doctrine."  *In re Prudential Sec. Ltd. P'ships. Litig.*, 930 F. Supp. 68, 72-73 (S.D.N.Y. 1996) ("Cautionary language cited to justify application of the [bespeaks caution] doctrine must precisely address the substance of the specific statement or omission that is challenged.").

[17]  Plaintiff's allegations of contemporaneous falsity further distinguish this case from those relied upon by Defendants.  *See, e.g., In re Acceptance Ins. Cos. Sec. Litig.*, 423 F.3d 899, 903-04 (8th Cir. 2005) (dismissal affirmed where complaint did not allege contemporaneous facts to indicate reserves inadequate during class period).

       *c)*   *Reserves Relate To The Current Period And Are Not Forward Looking Statements*

Defendants further argue – unsupported by references to the relevant accounting literature – that reserves for loan losses are just "predictions about the future." Def. Br. at 20. This is simply not correct. Defendants' position is untenable given fundamental principles of GAAP accrual accounting, as well as specific guidance provided by Statement of Financial Accounting Standards ("SFAS") 5 and 114.

Under basic accounting principles, revenues are offset against expenses on the basis of their cause-and-effect relationship in what is referred to by accounting professionals as the "matching principle." GAAP accrual accounting further provides that income is reported as earned and expenses are reported as they are incurred. *See*, *e.g.*, FASB Statement of Financial Accounting Concepts No. 6 (Elements of Financial Statements) ("FASB Concept Statement No. 6") (attached as Exh. 3 to the Pucillo Decl.).[18] Furthermore, GAAP requires companies to make current judgments about the recoverability of revenues that are recorded but may not be received, and to set up accruals to reflect reductions in those revenues.

GAAP accrual accounting distinguishes "probable" losses *inherent* in a portfolio as of the balance sheet date from possible or future losses *not inherent* in the balance sheet as of that date and requires the loss to be recorded against revenues in the period in which that loss becomes ascertainable. A loss is deemed to be incurred by the entity when it is probable and should be immediately reflected on the balance sheet – not at some later point when cash flows may be affected. Therefore, a loan loss reserve is a present-tense statement as to the financial position of a company and must be reflected in the current period financial statements. The accuracy of a

---

[18] Accrual accounting differs from "cash" accounting in that accrual accounting is intended to reflect the reality that various transactions and events have on an entity's financial position *at the time they have a substantive financial effect on the entity*, rather than in the period in which there is a change in the entity's cash position. *See*, *e.g.*, FASB Concept Statement No. 6.

company's financial statements, including the expectation that those financial statements reflect the true economic position of the company, is of central concern to investors.  These concepts are specifically addressed in the American Institute of Certified Public Accountants Audit and Accounting Guide for Depository and Lending Institutions ("D&L AAG").  The D&L AAG clearly states: "The allowance for loan losses [reserve] is an accounting estimate of credit losses *inherent in an institution's loan portfolio* that have been incurred *as of the balance-sheet date.*" D&L AAG at § 9.01 (describing accounting for credit losses). This excerpt is attached as Exh. 4 to the Pucillo Decl.  Accordingly, the relevant accounting guidelines clearly state that a loan loss reserve is <u>not</u> a forward-looking statement or expression of an opinion about the future, but rather is a statement about the present condition of the Company's loan portfolio.

In addition, there is specific accounting guidance on loan loss reserves which clearly state that a loan loss reserve is a statement of the Company's present financial condition.  SFAS 5 requires the accrual of a loss contingency when information available prior to the issuance of the financial statements indicates it is probable that an asset has been impaired when the financial statements are made and the amount of loss can be reasonably estimated.  If conditions are met, an accrual should be made even though particular loans that are uncollectible may not be identifiable.  Also, under SFAS 114, an individual loan is impaired when, based on current information and events, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement.  It is implicit in these conditions that it must be probable that one or more future events will occur confirming the fact of the loss.  Thus, under GAAP, the purpose of an allowance for loan losses is to cover probable credit losses that have *already been incurred* as of the date of the financial statements.

Of course, the fact that statements about the adequacy of loan loss reserves are actionable statements of current facts is confirmed by the case law, including cases upon which Defendants rely. *See In re PMA Capital Corp.*, 2005 U.S. Dist. LEXIS 15696, at *48-49 ("[S]tatements of loss reserves and their adequacy are not perse [sic] forward-looking.") (citing *Shapiro*, 964 F.2d at 274-75).[19]  Further, and contrary to Defendants' "hindsight" assertions, the court in *In re PMA* found that, "[t]he fact that PMA had to increase its loss reserves by over $300 million for 1997-2000 *is evidence that they may have been understated or incorrect at the time the registration statements and prospectuses were issued*." *Id.* at *50 (emphasis added).

Defendants' specificity arguments also miss the mark.  Contrary to Defendants' assertions, Plaintiff here is not required to make "factual allegations of specific culpable deficiencies in National City's loan loss methodologies, inputs or assumptions at the time of the Registration Statement."  Def. Br. at 22.  Tellingly, the citations Defendants rely upon for this proposition concern *fraud* claims.  *See California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 153 (3d Cir. 2004) ("Plaintiffs fail to identify with particularity any source for their accounting fraud claims."); *Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815, 823 (S.D. Cal. 2006), *aff'd.*, 256 F. Appx. 74 (9th Cir. 2007) ("[A] complaint alleging fraud based on understated reserves must 'include details about when and to what level the accounts receivable[s] should have been written down'") (citation omitted).[20]  This, however, is not a securities fraud case, and thus the specificity requirements of Federal Rule of Civil Procedure 9(b) are inapplicable.  *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 273 n.5 (3d Cir. 2004)

---

[19] This is another reason why Defendants cannot avail themselves of the "bespeaks caution doctrine." *See Sherleigh Assocs., LLC v. Windmere-Durable Holdings, Inc.*, 178 F. Supp. 2d 1255, 1274 (S.D. Fla. 2000) ("By definition, the bespeaks caution doctrine applies only to affirmative, forward-looking statements.")(citation omitted).

[20] Indeed, the very next sentence after the selected quote offered by Defendants from *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994), states, "nothing alleged indicates that management was promoting a fraud."

("[U]nlike claims brought under anti-fraud provisions of the 1934 Act, claims under the 1933 Act that do not sound in fraud are not held to the heightened pleading requirements of Fed. R. Civ. P. 9(b)"); *In re Sirrom Capital*, 84 F. Supp. 2d at 938 ("Since fraud is not a necessary element of a Section 11 claim, and the Court cannot read it into the statute, it need not be pleaded pursuant to Rule 9(b) in Plaintiffs' Section 11 claim.").

### d)  A Failure to Restate Does Not Absolve Defendants of Liability for Violating the Federal Securities Laws

Further, neither National City's failure to restate nor the fact that National City's auditors have not withdrawn their audit opinions (Def. Br. at 23), absolved Defendants of liability. *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (rejecting company's argument that because it "never restated any of its financials or otherwise indicated any error in the [] financial statements, and because its financial statements were audited by an independent accounting firm, no inference of accounting error" could be drawn).[21]  Although the only case upon which Defendants rely for this proposition, *In re 2007 Novastar Fin., Inc. Sec. Litig.*, Case No. 07-0139-cv-W-ODS, 2008 U.S. Dist. LEXIS 44166, at *13 (W.D. Mo. June 4, 2008), was a securities fraud case, even the court in *NovaStar*, acknowledged that, while the complaint allegations in that case "do not constitute securities fraud .... [t]hey may constitute negligence."

To the extent Defendants seek to establish an affirmative defense provided by Section 11 that pertains to the expertised portions of the registration statement (such as audited financial statements):[22]  (1) this affirmative defense is not available to National City, the issuer; (2) the Individual Defendants clearly have the burden of proving that they "had no reasonable ground to

---

[21] The court in *Aldridge* noted that, "To hold otherwise would shift to accountants the responsibility that belongs to the courts.  It would also allow officers and directors of corporations to exercise an unwarranted degree of control over whether they are sued, because they must agree to a restatement of the financial statements."  *Id.*

[22] *See* Section 11(b)(3)(C), 15 U.S.C. § 77k(b)(3)(C) (shielding from liability enumerated persons, *other than the issuer*, "who shall sustain the burden of proof" that they reasonably, and without actual knowledge of any inaccuracies, relied on parts of a registration statement "purporting to be made on the authority of an expert").

believe and did not believe" that the expertised portions contained material misstatements or

omissions; and, (3) the reasonableness of a defendant's reliance on the opinion of an expert, such

as an auditor, is not a question properly resolved on a motion to dismiss unless the affirmative

defense clearly appears on the face of the complaint, which it does not here.  *In re AFC Enters.,*

*Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1380 (N.D. Ga. 2004) ("determinations of the

reasonableness of a defendant's… reliance on expert opinion[s] are fact-intensive inquiries, they

are generally not properly resolved on motions to dismiss"); *In re Fleming Cos. Sec. &*

*Derivative Litig.*, Civil Action No. 5-03-md-1530 (TJW), 2004 U.S. Dist. LEXIS 26488, at *143

(E.D. Tex. June 10, 2004) ("The fact-specific determination of the reasonableness of a

defendant's investigation or of his reliance on the opinion of an expert is not a question properly

resolved on a motion to dismiss unless the affirmative defense clearly appears on the face of the

complaint."); *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 258 F. Supp. 2d 576, 639 (S.D.

Tex. 2003) (plaintiff does not have burden of pleading and proving affirmative defense of

reliance on expert's opinion, nor is determination of defendant's reliance a question properly

resolved on a motion to dismiss); *In re Hamilton Bankcorp*, Inc. Sec. Litig., 194 F. Supp. 2d

1353, 1357 (S.D. Fla. 2002) ("Defendants' contentions that they were entitled to and did rely on

the financial statements certified by [the bank's] auditor ... is an affirmative defense which

cannot be resolved on a motion to dismiss.").

### C.    Defendants Fail to Establish a Negative Causation Defense

Defendants expend a good amount of ink trying to convince this Court that the decline in

the price of National City stock was due to the "unprecedented" real estate market decline.  *See*

Defs' Br. at 1, 3-5, 11, 12.  However, loss causation is not an element of a claim under § 11, and

Plaintiffs do not have the burden of pleading or proving causation.  *In re Flag Telecom Holdings,*

*Ltd. Sec. Litig.*, 574 F.3d 29, 35-36 (2d Cir. 2009) ("[U]nder the '33 Act, it is the defendant who bears the burden of demonstrating that something other than the misstatement at issue caused plaintiff's loss."); *In re Adams Golf*, 381 F.3d at 277 ([P]laintiffs do not bear the burden of proving causation."); [*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 411 F. Supp. 2d 377, 382-83 (S.D.N.Y. 2006) ("[A] plaintiff is not required to plead] loss causation .... defendant has a 'heavy burden' of proving that the decline in stock price was caused by factors other than the misstatement(s) in the registration statement.").

Although Defendants may assert, as an affirmative defense, that a lower share value did not result from any omissions or misstatements in the registration statement ("negative causation"), "[t]he affirmative defense of negative causation is generally not properly raised on a Rule 12(b)(6) motion."  *In re Giant Interactive Group, Inc. Sec. Litig.*, 07 CIV 10588 (RWS), 2009 U.S.  Dist. LEXIS 69414, at *22-23 (S.D.N.Y. Aug. 5, 2009).  *See also, In re Adams Golf*, 381 F.3d at 277 ("While a defendant may be able to prove this 'negative causation' theory, an affirmative defense may not be used to dismiss a plaintiff's complaint under Rule 12(b)(6)."); *In re Fuwei Films*, 634 F. Supp. 2d at 444 ("Given the burden on Defendants to establish an affirmative defense such as negative causation, ... dismissal on this ground is more properly considered on a motion for summary judgment.").  Indeed, Defendant's
heavy burden [in establishing this defense] reflects Congress' desire to allocate the risk of uncertainty to the defendants in these cases."  *In re Flag Telecom*, 411 F. Supp. 2d at 383 (citations omitted).

A court may dismiss a Section 11 claim based on a negative causation defense only in unusual cases where negative causation is established "on the face of the complaint," and consequently, there could be no question that the drop in stock price was not attributable to

defendants' alleged misconduct.  *See In re Washington Mut.* 2009 U.S. Dist. LEXIS 41575, at

*54-55; *Briarwood Invs., Inc. v. Care Inv. Trust, Inc.*, 07 civ. 8159 (LLS), 2009 U.S. Dist.

LEXIS 18963, at *12 (S.D.N.Y. Mar. 4, 2009).  However, this is not one of those cases.  Courts

have rejected negative causation arguments, like the one made by Defendants here that the fall in

the company's stock price after the offering was caused, not by the misrepresentations or

omissions alleged in the complaint, but by market-wide forces or defaults on subprime

mortgages.  *See In re Washington Mut.*, 2009 U.S. Dist. LEXIS 41575, at *54 ("Although the

market downturn may have affected WaMu stock prices, this does not foreclose the possibility

that the alleged disclosures had an impact as well."); *Briarwood Invs.*, 2009 U.S. Dist. LEXIS

18963 at *12 ("One cannot conclude on the face of the amended complaint, as a matter of law,

that the drop in the price of [the company's] stock after the IPO was caused by a market-wide

downturn, rather than the disclosures [alleged].").

Clearly, Defendants' macro economic arguments fail to meet their burden of establishing

a negative causation defense.  As the court stated in *In re Countrywide Fin.*, 588 F. Supp. 2d at

1173-4, when reacting to defendants' repeated recitations "that an 'unprecedented' external

'liquidity crisis' caused all (or most) of Countrywide's decline:"

> [I]t is the Court's task to manage this litigation efficiently and avoid wasteful arguments
> .... '[J]ust as the Court could take judicial notice of the fact that the country suffered from
> the Great Depression in the 1930's, the Court cannot use that fact to infer anything in
> particular about a business operating at the time.'

Id. at 1173-4 (quoting *In re 2007 Novastar Fin., Inc. Sec. Litig.*, No. 07-0139-CV-W-ODS, 2008

U.S. Dist. LEXIS 44166, at *5 (W.D. Mo. June 4, 2008)).

### III.   THE COMPLAINT ADEQUATELY STATES CONTROL PERSON CLAIMS UNDER SECTION 15 OF THE SECURITIES ACT

Plaintiff asserts control person claims under Section 15 of the Securities Act, 15 U.S.C. § 77o, against the Individual Defendants.  ¶¶103-106.[23]  In order to state a claim for control person liability under Section 15 of the Securities Act, plaintiff must allege an underlying primary violation under either Section 11 or 12 of the Securities Act.  *See* 15 U.S.C. § 77o.  Since Plaintiff has established a primary violation of Section 11, *see* Section II *supra*, Plaintiff's claim under Section 15 should also be upheld at this stage in the proceedings.  *See, e.g., In re FirstEnergy Corp.*, 316 F. Supp. 2d at 602 (denying Defendants' motion to dismiss, finding plaintiffs had sufficiently stated claims under Sections 11 and 15 of the Securities Act).

### IV.   THE COMPLAINT ADEQUATELY STATES A SECTION 11 CLAIM AGAINST DEFENDANT ZOELLER

Section 11 provides liability against, among others, "every person who signed the registration statement."  *See* 15 U.S.C. § 77k(a). Defendant Zoeller, however, argues that he is not liable under Section 11, despite having signed the Registration Statement, since he merely signed as an attorney-in-fact on behalf of the Company's officers and directors.  Def. Br. at 24. This attempt to inject an additional requirement into the statute; to wit, that liability only extends to those who sign a registration statement in their personal capacity or as an officer or director, should be rejected by this Court.  The plain language of the statute extends to anyone who signed the registration statement, regardless of position or title.  *Harden v. Raffensperger, Hughes &*

---

[23] Section 15 of the Securities Act provides:
> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under section 11 or 12 [15 USCS § 77k or 77l] of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.  *See* 15 U.S.C. § 77o.

*Co.,* 933 F. Supp. 763, 771 (S.D. Ind. 1996) ("The category of defendants upon whom [Section 11] strict liability is imposed includes *all* signers of the registration statement.") (emphasis added).  As such, this argument should be ignored for what it is, a red herring.  Moreover, Defendant Zoeller's reliance on *Eller Media Co. v. DGE, Ltd.*, Nos. 83273, 83286, 2004 WL 2002449 (Ohio App. 8 Dist. Sept. 9, 2004) is misplaced since that case involved a claim for breach of contract and has nothing to do with liability under § 11 of the Securities Act.  As such, Defendant Zoeller's argument that he may not be held liable, despite having signed the Registration Statement, should be rejected by this Court.

## **CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss should be denied.

Dated: December 9, 2009                          Respectfully submitted,

BERMAN DEVALERIO

/s/ Michael J. Pucillo
Michael J. Pucillo
[Florida Bar Registration No. 261033]
E-mail:  mpucillo@bermandevalerio.com
Wendy H. Zoberman
[Florida Bar Registration No. 434670]
Email:  wzoberman@bermandevalerio.com
4280 Professional Center Drive, Suite 350
Palm Beach Gardens, FL  33410
Telephone:     (561) 835-9400
Facsimile:      (561) 835-0322
and
Abigail R. Romeo
[Massachusetts Bar Registration No. 657680]
E-mail:  aromeo@bermandevalerio.com
1 Liberty Square
Boston, MA 02109
Telephone:     (617) 542-8300
Facsimile:      (617) 542-1194
*Attorneys for Plaintiff B.H. Reagan*

## CERTIFICATE OF COMPLIANCE

I, Michael J. Pucillo, do hereby certify that the foregoing Memorandum of Law in

Opposition to Defendants' Motion to Dismiss the Complaint complies with the page limitations

set forth in Local Rule 7.1(f).

 /s/   Michael J. Pucillo
Michael J. Pucillo
[Florida Bar Registration No. 261033]
E-mail:  mpucillo@bermandevalerio.com
4280 Professional Center Drive, Suite 350
Palm Beach Gardens, FL  33410
Telephone:     (561) 835-9400
Facsimile:     (561) 835-0322

## CERTIFICATE OF SERVICE

I hereby certify that  on December 9, 2009, a copy of foregoing Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. mail.  Parties may access this filing through the Court's system.

/s/   Michael J. Pucillo
Michael J. Pucillo
[Florida Bar Registration No. 261033]
E-mail:  mpucillo@bermandevalerio.com
4280 Professional Center Drive, Suite 350
Palm Beach Gardens, FL  33410
Telephone:     (561) 835-9400
Facsimile:      (561) 835-0322